Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1014 | **DATE** | 5/14/2003 |
| **CASE TITLE** | Kinlaw vs. Alpha Baking Co., Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment [9-1] is denied. Case remains set for trial on 6/2/03. In the meantime, parties are directed to meet in a sincere effort to resolve this case.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAY 15 2003 date docketed | |
| | Notified counsel by telephone. | | | 22 |
| | Docketing to mail notices. | ED-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Mail AO 450 form. | 03 MAY 14 PM 3:31 | 5/14/2003 | |
| | Copy to judge/magistrate judge. | CLERK U.S. DISTRICT COURT | date mailed notice | |
| MD | courtroom deputy's initials | Date/time received in central Clerk's Office | MD mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GARY KINLAW,

    Plaintiff,

vs.

ALPHA BAKING CO., INC.,

    Defendant.

No. 02 C 1014
Judge Joan H. Lefkow

DOCKETED
MAY 1 5 2003

## MEMORANDUM OPINION AND ORDER

In this action filed by plaintiff, Gary Kinlaw ("Kinlaw"), alleging discrimination (Count I) and retaliation (Count II) in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12102 *et. seq.*, defendant, Alpha Baking Co., Inc. ("Alpha"), has moved under Rule 56, Fed. R. Civ. P., for summary judgment. For the reasons set forth below, Alpha's motion is denied.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to

designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF

Alpha is an Illinois corporation with an office located in Chicago, Illinois. (Def. L.R. 56.1 ¶ 2.) Kinlaw served as a routeman at Alpha's Chicago office from approximately 1990 until July 1999. (Def. L.R. 56.1 ¶ 4.) During this time, Kinlaw's work responsibilities included selling and delivering bread products to schools, restaurants, hospitals and office buildings. (Def. L.R. 56.1 ¶ 4.) In July 1999, Kinlaw suffered a debilitating back injury when the delivery truck he was driving for Alpha malfunctioned. (Pl. L.R. 56.1 ¶ 2.) This injury rendered Kinlaw unable to work from July 1999 until May 2002. (Def. L.R. 56.1 ¶ 5.) The injury also required Kinlaw to undergo back surgery in September 1999. (Def. L.R. 56.1 ¶ 5.)

On approximately April 29, 2000, Kinlaw faxed a copy of a doctor's note outlining his current health status to Mike Rosen ("Rosen"), Alpha's Human Resource Manager. (Pl. L.R. 56.1 ¶ 5.) Rosen told Kinlaw that he should come to the office because they "had work for him." (Pl. L.R. 56.1 ¶ 5.) Kinlaw returned to work at Alpha on approximately May 8, 2000 with a doctor's note limiting the types of physical activities he could perform. (Def. L.R. 56.1 ¶ 6.) Specifically, the note prohibited Kinlaw from sitting for more than 30 minutes at a time and

2

restricted his ability to lift, carry, walk, bend, drive, kneel and twist. (Def. L.R. 56.1 ¶ 6.) These limitations, which remained in place for the remainder of Kinlaw's employment, prevented Kinlaw from returning to his position as a routeman. (Def. L.R. 56.1 ¶ 6.) As such, he was trained and assigned to work in the office as a dispatch and office worker. (Pl. Resp. to Def. L.R. 56.1 ¶ 7.) His responsibilities included "taking customer phone orders, answering the phone, speaking to customers and drivers by phone, and checking in drivers returning to the bakery." (Def. L.R. 56.1 ¶ 10.) Kinlaw's initial understanding of his work day was that "he should work at least 8 hours per day but he [would be] allowed to leave around 2 p.m. if he asked and it was not that busy." (Pl. L.R. 56.1 ¶ 11.) He typically worked six-hour days during this time period. (Pl. L.R. 56.1 ¶ 12.)

Kinlaw believed that his position as an office/dispatch worker was permanent and was not a condition of any temporary "light duty" status. (Pl. Resp. to Def. L.R. 56.1 ¶ 7.) Kinlaw contends that he was not informed that his new position was temporary. (Pl. L.R. 56.1 ¶ 7.) According to Kinlaw, Alpha was in the process of implementing new policies that required three workers to be in the office. (Pl. L.R. 56.1 ¶ 8.) As such, he believed his position was created to carry out this new policy. (*Id.*)

On May 25, 2000, Kinlaw again visited his doctor. At that time, the doctor issued a 'permanent' return to work note which had the same restrictions as the prior note, except it requested that he be allowed to only work six hours per day." (Pl. Resp. to Def. L.R. 56.1 ¶ 13.) Kinlaw maintains that although he presented this note to Rosen, his status as an office employee did not change. (Pl. Resp. to Def. L.R. 56.1 ¶ 13.)

3

According to Kinlaw, in September, 2000, Gene Keck ("Keck"), Alpha's Director of Route Sales, and John Bruno ("Bruno"), Kinlaw's direct supervisor, informed Kinlaw, "It's coming to an end. You are going to have to work this position these hours or you don't have a job." (Pl. L.R. 56.1 ¶ 14.) Kinlaw was then told his hours were being increased to 10 1/4 per day and he would have to work six days a week, including Sundays. (Pl. Resp. to Def. L.R. 56.1 ¶ 16.) Shortly thereafter, Kinlaw left for a three-week vacation. (Def. L.R. 56.1 ¶ 16.) When he returned he was told that he needed to obtain a doctor's note lifting the six-hour per day work restriction. (Def. L.R. 56.1 ¶ 17.) Kinlaw was suspended from work for approximately one week in October, 2000 because he did not secure a doctor's note to lift the work restrictions. (Pl. L.R. 56.1 ¶ 19.) On October 5, 2000, Kinlaw met with his doctor who then provisionally lifted the hour restriction to determine if Kinlaw was, in fact, physically able to handle the increase in hours. (Pl. Resp. to Def. L.R. 56.1 ¶ 17.) A follow-up appointment was scheduled for January 4, 2001. (Pl. Resp. to Def. L.R. 56.1 ¶ 17.) Kinlaw worked the 10 1/4 hour day, six days a week, from October through December 2002. (Pl. Resp. to Def. L.R. 56.1 ¶ 19.) Beginning in December, 2002, Kinlaw began to suffer physical disabilities. After the follow-up visit on January 4, 2001, and because Kinlaw's condition was deteriorating, Kinlaw's doctor issued a note re-instituting the six-hour work day restriction. (Pl. L.R. 56.1. ¶ 23.) Kinlaw presented this note to Alpha on January 5, 2001. (Pl. L.R. 56.1 ¶ 24.)

On Tuesday, January 9, 2001, Kinlaw learned he was being terminated after Bruno asked him to turn over his pager and work ID, and told him that he had to meet with Rosen. (Pl. L.R. 56.1 ¶ 24.) Kinlaw's conversation with Bruno was the first time he received any indication he was being fired. (Pl. L.R. 56.1 ¶ 25.) After turning over his work equipment, Kinlaw met with

Rosen and Larry Marcucci ("Marcucci"), the President of Alpha Baking. (Pl. L.R. 56.1 ¶ 26.) When Kinlaw asked why he was being terminated, Marcucci replied that it was because he "had a doctor's restriction, and the company had nothing to accommodate him." (Pl. L.R. 56.1 ¶ 26.) Kinlaw asserts that Alpha at no time discussed possible accommodations to his restriction. (Pl. L.R. 56.1 ¶ 26.)

## DISCUSSION

In Count I, Kinlaw alleges that Alpha violated the ADA by failing to reasonably accommodate his debilitating back injury suffered while working for Alpha. In Count II, Kinlaw alleges that Alpha retaliated against him for exercising his protected rights under the ADA.

### A. Count I: ADA Claim

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Basith* v. *Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). In addition, "[t]he Act also provides that an employer discriminates against a qualified individual with a disability by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McPhaul* v. *Board of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000), quoting 42 U.S.C. § 12112(b)(5)(A). As such, "there are two distinct categories of disability discrimination claims: failure to accommodate and disparate treatment." *Basith*, 241 F.3d at 927, quoting *Sieberns* v. *Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). Kinlaw proceeds on a failure to accommodate theory.

5

To establish a reasonable accommodation case, Kinlaw must show that (1) he was disabled; (2) his employer was aware of his disability; and (3) he was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position. *Basith*, 241 F.3d at 927. For purposes of this motion, the parties do not dispute that Kinlaw is disabled or that Alpha was aware of the disability. Alpha contends that it is entitled to summary judgment because Kinlaw is not a qualified individual who could perform the essential functions of his office/dispatch position with or without reasonable accommodations. The court will first examine whether Kinlaw was a qualified individual with a disability under the ADA and then examine whether Alpha failed to reasonably accommodate him.

*1. Qualified individual with a disability*

To determine whether Kinlaw is a "qualified individual with a disability," a two-step analysis must be applied. *Basith*, 241 F.3d at 927, citing 29 C.F.R. app. § 1630.2(m). The first step is to determine whether the disabled individual "satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Basith*, 241 F.3d at 927, citing *Bombard* v. *Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). Next, the court must consider "whether the individual can perform the essential functions of the position held or desired, with or without reasonable accommodations." *Id.* Alpha does not argue that Kinlaw lacks the necessary prerequisites for the office/dispatch position, making it unnecessary to consider the first element of the two-part test. At issue is whether Kinlaw's ability to perform the essential functions of his job is limited by his inability to work more than six hours per day.

6

Alpha contends that working a full-time 10 1/4 hour per day schedule is an essential function of the office/dispatch position because "[d]ispatchers had to be present to respond to phone inquiries and in-person driver inquiries for approximately nine hours per day." (Def. Mot. for Summ. J. at 6.) As such, Alpha asserts that Kinlaw was unable to perform this essential function because he was only able to work six hours per day.

The ADA defines the term "essential functions" to mean "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). In determining what are the essential functions of a position, a court may consider "evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job and the work experience of current incumbents in similar jobs." *Basith*, 241 F.3d at 927, citing 29 C.F.R. § 1630.2(n)(3). The court believes three factors illustrate that genuine issues of material fact exist as to whether working 10 1/4 hours per day was an essential function of the office/dispatch job.

First, as stated in *Basith*, "written job descriptions are clearly instances of the employer's judgments as to which functions are essential." *Basith*, 241 F.3d at 928. Kinlaw maintains that the hour requirement was not an essential function of the office/dispatch job given that it was not listed in any of the written job descriptions. To support his position, Kinlaw points to the fact that "[t]here is nothing in writing calling for a dispatcher job to be 10 1/4 hours per day, five days a week, plus Sunday, nor is the 10 1/4 hour requirement reflected in the essential functions of the position set forth in the Dispatcher Job Description." (Pl. L.R. 56.1 ¶ 15.) Alpha concedes the fact that there was nothing in the job descriptions during or after Kinlaw's employment stating

7

that the 10 1/4 hour day was essential to the office/dispatch position. (Def. Resp. to Pl. L.R. 56.1 ¶ 15.) Nonetheless, Alpha maintains that it was essential Kinlaw work full-time because the nature of the job required that he be in the office for more than six hours per day. (Def. Mot. for Summ. J. at 6.)

Second, in further support of his contention that working 10 1/4 hours per day was not essential, Kinlaw asserts that he "routinely worked six hour days until the defendant demanded he increase his schedule to 10 1/4 hours when an office co-worker left." (Pl. Resp. to Def. Mot. for Summ. J. at 1.) Alpha, however, states that Kinlaw initially was allowed to work a reduced schedule because he was placed on "light duty status." Under the ADA, employers are encouraged to establish a light duty program to reserve positions for employees recovering from injuries. *Watson v. Lithonia Lighting & Nat'l Serv. Indus., Inc.*, 304 F.3d 749, 752 (7th Cir. 2002). This is "exactly what the ADA encourages" because it gives income to the employee, helps the employee to keep his skills honed, and provides an employer with experienced workers. *Id.*

Kinlaw argues there is a genuine issue of material fact as to whether his employment at this time was permanent or was light-duty status. In support, he notes that he was never told that his office/dispatch position was a temporary assignment, a fact which Alpha concedes. (Def. Resp. to Pl. L.R. ¶ 7.) Additionally, Kinlaw asserts he was not given a job typically reserved for light duty employees. Kinlaw maintains that typical light duty assignments included "counting bread trays, answering phones, sweeping up or any other suitable tasks." Keck, in his deposition, described at least some of the functions of light duty status when testified that "[w]hat we do is count trays. So we had him count trays, and in between the time he would come to work and,

8

you know, the trucks would come in spotty, so, he would sit in the office and sit down and relax and pick up a phone every once in a while and answer a phone in the beginning." (Keck dep. at 12.) The record also contains evidence suggesting that John Shaw, another injured employee, counted trays and washed trucks for approximately a year while he was on light duty status. (Pl. L.R. 56.1 ¶ 4.) Kinlaw claims that his duties during this time included "dispatching special deliveries and house accounts, arranging pick-ups of material, answering calls, separating tickets, sending equipment out for repair, and signing drivers in and out." (Pl. L.R. 56.1 ¶ 13.) Kinlaw also maintains that, unlike an employee on light duty status, he was trained by Ron Gatta, the head dispatcher, to work in the office.[1] (Pl. L.R. 56.1 ¶ 13.) In response to this evidence, Alpha states that the light duty program was made up of "miscellaneous tasks not normally assigned to one employee," (Def. L.R. 56.1 ¶ 8.), and that as long as the task was "within the employee's physical restrictions" and not already assigned to another person, it could be used for light duty status. (Def. L.R. 56.1 ¶ 8.)

Finally, Kinlaw asserts that the work schedule of past and current office/dispatch workers further proves that working 10 1/4 hours per day is not essential to the position. Prior to his assuming the office/dispatch position, Kinlaw claims that his job duties were rotated among supervisors who were in the office. (Pl. L.R. 56.1 ¶ 29.) Additionally, he alleges that after he

---

[1] Alpha claims that the record references do not support the assertion of any training. In his deposition, Gatta stated:

Q: Who trained Gary to work in the office?
A: I did.
Q: And Jim did not train Gary at all?
A: Not that I know of, no.

(Gatta dep. at 19-20.)

9

was fired, Alpha never filled the position with a 10 1/4 hour a day employee who also worked Sundays. Instead, Bruno and Gatta filled the position in the mornings while the afternoons were rotated between the route supervisors, including Ron Konet, Mike Zawicki and Pete Anagnos. (Pl. L.R. 56.1 ¶ 30-31.) Sundays were handled by Bill Perakis. (Pl. L.R. 56.1 ¶ 28.) Moreover, Rosen, in his deposition, testified as follows,

> Q: Who took over Mr. Kinlaw's position?
> A. Nobody really took over the position on a full time basis.
> Q: Did anyone take it over on a part-time basis?
> A: It would be done by whoever happened to be in the office at that time. If a supervisor was in there, generally they would answer the phone and do those types of duties.
> Q: Do you know who those supervisors were that took over those duties?
> A: One [sic] again, it could have been any of the supervisors who worked there. Ron Konet, Mike Zawicki, Pete Aganus [sic], and I don't know who else might have come around through there.
> Q: So no one formally became a dispatcher in place of Mr. Kinlaw?
> A: No.

(Rosen dep. at 51-52.) Kinlaw argues that this establishes that it was not essential for him to be in the office 10 1/4 hours a day, six days a week. Alpha's response is the factually disputed view that Pete Anagnos took over the position and that the functions of the job could be parceled out, thereby creating a burden for the company and its employees, does not mean that Kinlaw could perform the essential functions of the job.

After an examination of the factors listed above and the parties' evidence, the court concludes that a reasonable trier of fact could agree with Kinlaw that the essential function of his position as an office/dispatch worker did not require a 10 1/4 hour work day. Kinlaw has presented evidence that such a requirement was not included in written job descriptions, that he was never replaced by any one individual who worked such a 10 1/4 hour shift, and that he, in

10

fact, worked less than 10 1/4 hours while he was in this position. While Alpha does present evidence in response that a trier of fact may find equally persuasive, it is not the court's role in this motion to weigh the evidence. Kinlaw has demonstrated genuine issues of material fact as to whether the office/dispatch position required him to work 10 1/4 hours per day. Accordingly, summary judgment must be denied on the claim that the essential functions of the office/dispatch position required a 10 1/4 hour work day.

2. *Reasonable accommodation*

Having established that Kinlaw is a "qualified individual with a disability" for purposes of this motion, the court must now address whether Alpha failed to provide a reasonable accommodation. A reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Reasonable accommodations may include "job restructuring" and "part-time or modified work schedules." 29 C.F.R. § 1630.2(o)(2)(ii). An employee discriminates under the ADA when it fails to make reasonable accommodations to an employee with a disability unless the employee can demonstrate the accommodation would impose an undue hardship on the operation of its business. 42 U.S.C. § 12112(b)(5)(A).

According to Kinlaw, his request to work six-hours per day is a "presumptively reasonable" accommodation under the ADA. He states that it would not be unduly burdensome for Alpha to accommodate his request given that the "defendant is a multi-millionaire company with revenues exceeding $120,000,000 and over 500 hundred employees." (Pl. Resp. to Def.

11

Mot. for Summ. J. at 11.) Additionally, he states Alpha's practice of "using Ron Gatta and John Bruno in the morning and rotating the route supervisors in the afternoon" further proves Alpha would not be unduly burdened by having to use a part-time worker in the position. According to Kinlaw, this "everyday practice of routinely rotating multiple supervisors and managers undermines the Defendant's claim of hardship." (Pl. Resp. to Def. Mot. for Summ. J. at 12.) Alpha believes it reasonably accommodated Kinlaw by giving him "light duty status," "allow[ing] him to work a short day and to take frequent breaks," and "giving him a job within his physical limits and allowing him to get his physician's approval for the longer workday required for the job." (Def. Reply Mot. for Summ. J. at 8.) With respect to rotating supervisors, Alpha asserts that "allowing Kinlaw to work a part-time schedule would require Alpha to place other employees into his job on a part-time basis." (Def. Mot. for Summ. J. at 7.) This, in turn, "would force Alpha to abandon the structure of the dispatcher position and cause forbidden 'redundant staffing.'" (Def. Mot. for Summ. J. at 7.) Moreover, Alpha states that it would be an undue hardship to allow Kinlaw to work part-time because it would force supervisors to have to either stay late or come in later than usual in order to have the three to four hours covered that Kinlaw would miss. (Rosen Aff. at 8.)

Based on the evidence as presented by the parties, the court is not in a position to say as a matter of law that it was an undue burden for a company such as Alpha to give Kinlaw a six-hour work day, particularly when there are genuine issues of fact as to whether any employee that replaced Kinlaw worked 10 1/4 hours per day. Once again, while Alpha may be able to present evidence that a reasonable jury would find persuasive on this issue, genuine issues of material fact exist which preclude summary judgment.

12

Because genuine issues of material fact exist concerning whether Kinlaw could perform his job's essential functions and as to whether Alpha failed to give him a reasonable accommodation, summary judgment is denied on the Count I ADA claim.

## 2. Count Two: Retaliation

Alpha seeks summary judgment on Kinlaw's claim for retaliation under the theory that the "undisputed facts show that once Plaintiff informed Alpha that he could no longer work on a full-time basis, there simply was no job available to him." (Def. Mot. for Summ. J. at 10.) According to Alpha, this establishes there is no issue of retaliatory motivation. Nonetheless, Alpha concedes that "if the Court denies Alpha's motion on the disability claim, it should deny the motion on the retaliation claim since some (but not all) issues of material fact would be the same." (Def. Resp. Mot. for Summ. J. at 11.) The court has concluded that issues of material fact exist as to Kinlaw's ADA claim. Therefore, Alpha's motion for summary judgment on the retaliation claim under Count II is also denied.

## CONCLUSION

For the reasons stated above, the court denies Alpha's motion for summary judgment [#9]. This case is set for trial on June 2, 2003. In the meantime, the parties are directed to meet in a sincere effort to resolve this case.

ENTER:

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: May 14, 2003

13